259 So.2d 768 (1972)
James L. VINSON, Appellant,
v.
FORD MOTOR CREDIT COMPANY, Appellee.
No. N-523.
District Court of Appeal of Florida, First District.
March 30, 1972.
*769 Alan R. Schwartz, of Horton & Schwartz, Miami, and Ginsberg & Ginsberg, Daytona Beach, for appellant.
Alfred A. Green, Jr., of Green & Strasser, Daytona Beach, for appellee.
RAWLS, Judge.
This cause might well be labeled as a "Consumer Credit Case." Plaintiff Vinson filed his amended complaint seeking compensatory and punitive damages alleging that "Defendant willfully and maliciously libeled and or slandered said Plaintiff in his credit and reputation with the intent to prevent him from procuring credit." After trial of the cause, the jury returned a verdict for plaintiff in the sum of $5,000.00 for compensatory damages, and $20,000.00 as punitive damages. Upon hearing defendant's post-trial motion, the trial judge entered a final judgment in favor of defendant.
Appellant-plaintiff Vinson's basic point on this appeal is that the trial judge erred in granting appellee-defendant Ford Motor Credit Company's reserved motion for a directed verdict thereby setting aside the jury's verdict and entering a judgment for the defendant.
These facts, considered in a light most favorable to plaintiff, constitute an essay detailing an individual's confrontation with "big business" and "computer documentation." It could well be that George Orwell's mythical year of 1984 has arrived.
On August 16, 1968, James Vinson, a new resident of the Daytona Beach area, purchased with a down payment of $885.99 a Ford Fairlane "demonstrator" automobile, with a new car warranty, from a Ford dealer in Sanford, Florida. The balance of the purchase price was financed with Ford Motor Credit Company and secured by a conditional sales contract calling for monthly payments of $68.67. In the latter part of October 1968, Vinson's "new car warranty" Fairlane failed to start. He called the nearest Ford dealer, Warren Taylor of Daytona Beach, Florida, who towed the car to his repair shop and performed minor repairs. Vinson paid for the towing and the repair bill, but upon driving it found that the engine was knocking. Some two weeks later, Vinson delivered the car back to Warren Taylor for performance of the 6,000-mile checkup and to ascertain the reason for the engine knock. It was at this point that Vinson became immersed in a morass of business bureaucracy.
Warren Taylor advised Vinson that the Fairlane's engine had a defective piston which would require a monetary outlay of approximately $350.00 to correct. Vinson asked Warren Taylor to repair same pursuant to Ford's new car warranty. The reply was that the records of the owner prior to Vinson did not reflect preventive maintenance called for by the warranty. Vinson responded with the fact that the automobile prior to his purchase had been used only as a demonstrator by the Sanford Ford dealer. From day to day Vinson, during his few hours off from work, attempted but to no avail to get the car repaired pursuant to the warranty. All of this time (more than a month) the Fairlane remained unusable at Warren Taylor's shop. Vinson contacted Ford Credit agent, Mr. Mowerly, who, being unable to resolve the impasse, suggested he contact Mr. J.J. O'Grady, Ford Motor Company's agent in Jacksonville. Vinson called Mr. O'Grady several times and left "call-back" messages, but was unable to reach him. Finally, on December 15, 1968, Vinson, who had timely continued making the monthly payments on a car that wouldn't run properly and which he had been deprived the use of for more than a month, arranged with Ford Motor Credit to "voluntarily deliver"[1] to them *770 the Fairlane. Vinson was advised by Mr. Mowerly that he would take the car back as a return; he was sorry that Vinson had so much trouble with the car; and that Ford Motor Credit would be happy to finance a car in the future for Vinson. As of December 15, the date of the return of the Fairlane by Vinson to Ford Motor Credit, Vinson had timely made all monthly payments of $68.67, and his total investment in the Fairlane was $1,092.00, with approximately two weeks payment being prepaid.
After accepting Vinson's voluntary return of the Fairlane, Ford Motor Credit notified Vinson on December 18, 1968, that it would sell the Fairlane in 10 days at a private sale unless Vinson redeemed the car prior to the sale date. Ford Motor Credit further informed Vinson that "the proceeds of the sale will be applied first to the payment of the expenses of retaking, holding, preparing for sale and selling said property and reasonable attorney's fees and legal expenses incurred by the undersigned ... Any surplus will be paid to you and you will remain liable for any deficiency."[2] On December 16, 1968, a pink slip was forwarded by Ford Motor Credit to the Credit Bureau of Daytona Beach, Florida, which volunteered the information that James L. Vinson had a balance of $2,266.00 with Ford Motor Credit, his payment record with Ford Motor Credit was unsatisfactory, and the item "repossessed" was checked. Vinson testified that he exhausted every effort, but to no avail, to get Ford Motor Credit to correct the information it had forwarded to Daytona Credit Bureau. On this allegation Ford Motor Credit was able to offer no rebutting testimony.
The personnel of Ford Motor Credit testified that their records reflected the Fairlane was abandoned by Vinson and did not show a voluntary return; that under their agreement with credit reporting bureaus, they reported adverse credit information to such bureaus; and that their records make no distinction between voluntary returns or involuntary repossessions of a vehicle.
As we view the contentions of the parties, the essential issue in this cause is whether a distinction exists in the ordinary usage of "voluntary return" or "repossession." Defendant argues strenuously that no expert testimony was adduced by plaintiff reflecting that the term "repossession" was false within the practice and procedure of those dealing with credit information and, therefore, the testimony of defendant's Collection Supervisor that no distinction is made must stand as true. We disagree.
Plaintiff Vinson testified that he had been employed by two firms as a credit manager and that a difference is drawn in credit information between "voluntary return" and "repossession." We question the necessity of expert testimony as to the ordinary meaning of terms used in chattel financing. Any man's neighbor can probably testify that "repossession" results from a failure of the buyer to "keep up" his payments. By like token, a "voluntary return," coupled with a "voluntary acceptance by the seller," usually results from an agreement that no further liability exists on the buyer's part. Of even greater persuasion is that under the uncontroverted facts here adduced Vinson "voluntarily returned" the automobile to Ford Motor Credit while the conditional sales contract was not in default and Ford Motor Credit "voluntarily accepted" the returned car and agreed that there would be no further liability on Vinson's part. Further, Ford Motor Credit advised Vinson in one breath that his future credit with that company was good, but almost in the same breath advised the Daytona Credit Bureau that Vinson's payment record was unsatisfactory and it had repossessed his automobile. Such callous disregard for the truth constitutes libel per se, especially when coupled *771 with a gross failure to take any steps to correct the lies it transmitted.[3]
The able and learned trial judge apparently was of the opinion that the communication between a credit bureau and one of its members was conditionally privileged and thus not actionable and in so concluding relied upon Putnal v. Inman.[4] There, the Supreme Court held that merchants have the right to organize for their own protection, and to enter into mutual agreements for the purpose of giving each other the benefit of their knowledge about those in the community who meet their obligations promptly and those who do not, and that a communication on this subject made by a member of the association to the other members is privileged, if made in good faith and in such a manner and on such an occasion as to properly serve the purposes of the association. The foregoing decision supports a conditional privilege doctrine as to such communications. If such conditional privilege theory still prevailed in this State, we would be inclined to affirm the judgment appealed.
Times change and principles of law change with them.[5] "A man's credit in this day and age is one of his most valuable assets and without it, a substantial portion of the American people would be without their homes, washing machines, refrigerators, automobiles, television sets, and other mechanical paraphernalia that are now regarded as necessities of life."[6] The impersonal and unconcerned attitude displayed by business machines as to the impact of their actions upon an individual consumer as here reflected was the catalyst for our National Congress to pass the Fair Credit Reporting Act,[7] which provides protection for consumers from irresponsible credit reporting agencies. We decline to follow the Putnal decision and hold that no privilege is available to Ford Motor Credit Company.
The judgment appealed is reversed with directions to reinstate the jury verdict and enter final judgment in favor of plaintiff.
Reversed and remanded with directions.
SPECTOR, C.J., and JOHNSON, J., concur.
NOTES
[1] The automobile was in the shop of Warren Taylor Ford Agency, Daytona Beach.
[2] The conditional sales contract was not in default.
[3] Diplomat Electric, Inc. v. Westinghouse Electric Supply Co., 378 F.2d 377 (5 Cir.1967).
[4] Putnal v. Inman, 76 Fla. 553, 80 So. 316 (1918).
[5] G.S. & F. Ry. Co. v. Seven-Up Bottling Co. of South Ga., 175 So.2d 39 (Fla. 1965).
[6] American Fire and Casualty Co. v. Davis, 146 So.2d 615, 619 (1 Fla.App. 1962).
[7] 15 U.S.C. § 1681. Also see Protecting the Subjects of Credit Reports, 80 Yale L.J. 1035 (1971).